IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

MANDI LYNNE PATTERSON,

                        Plaintiff,

                                        Civil Action No.
        v.                              5:11-CV-1143  (MAD/DEP)

MICHAEL J. ASTRUE, Commissioner
of Social Security,

                        Defendant.

_____

APPEARANCES:                            OF COUNSEL:

FOR PLAINTIFF:

OLINSKY LAW GROUP                       KAREN S. SOUTHWICK, ESQ.
One Park Place
300 South State Street
Syracuse, New York 13202

FOR DEFENDANT:

HON. RICHARD S. HARTUNIAN               VERNON NORWOOD, ESQ.
United States Attorney                  Special Ass't U.S. Attorney
Northern District of New York
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Mandi Lynne Patterson, who suffers from several diagnosed mental impairments, has commenced this proceeding against the Commissioner of Social Security, pursuant to 42 U.S.C. § 405(g), seeking judicial review of an administrative determination denying her application for supplemental security income ("SSI") benefits. In support of her challenge, plaintiff argues that the decision of the administrative law judge ("ALJ") that led to the denial of benefits is fatally flawed for three reasons. First, she contends that the ALJ's residual functional capacity ("RFC") determination, representing an inventory of her ability to perform work-related activities, is not supported by substantial evidence. Plaintiff further contends that the ALJ erred in assessing her credibility and discounting her statements regarding the limitations imposed by her impairments. Lastly, she asserts that the ALJ's determination at step five of the governing sequential analysis, relating to the availability of work she is able to perform notwithstanding her impairments, is not supported by substantial evidence.

Having carefully considered the record now before the court, in light of the parties' arguments, and applying the requisite level of deference

owed to the Commissioner's determination, I find that the ALJ erred in assessing plaintiff's credibility, and recommend that the matter be remanded for further proceedings consistent with this report.

## I.     BACKGROUND

Plaintiff was born in August 1979; and at the time of the hearing in this matter held on April 7, 2011, she was 31 years old.  Administrative Transcript at 16, 41, 150.[1]   Plaintiff is married and has six children, five of whom live with her in Fulton, New York.  *Id.* at 20, 150.  Plaintiff does not possess a driver's license.[2]  *Id.* at 16, 19, 20, 182.

Plaintiff attended high school only through the tenth grade, but has since earned a general educational development ("GED") diploma, and has attended a community college for one semester.  *Id.* at 16-17. Plaintiff held a variety of jobs prior to filing her application for SSI benefits, including working as a gas station attendant, an aide at an adult home, an assistant at a nursing home, and a waitress or dishwasher at a restaurant.

---

[1]     Portions of the administrative transcript, Dkt. No. 10, which is comprised of the evidence and proceedings before the agency and was filed by the Commissioner together with his answer, will be hereinafter cited as "AT __."

[2]     During her last road test for a driver's license, plaintiff drove around a handicapped bus in a school zone.  *Id.* at 28-29.  After being admonished for having done so by her driving instructor, plaintiff experienced a panic attack, and was issued a traffic ticket.  *Id.*  The charge was ultimately reduced because of plaintiff's mental condition.  *Id.* at 29, 46.

AT 18, 25-27, 174, 188. Plaintiff was fired from her job at the gas station for selling cigarettes to minors. *Id.* at 19. Plaintiff's employment at the adult home was terminated because she dispatched residents to run personal errands for her. *Id.* at 27-28. Plaintiff lost her nursing home job for providing patients with the wrong medication and falling asleep on the job. *Id.* at 26. Plaintiff quit her employment at the restaurant after an argument with the head cook. *Id.* at 26-27. At the hearing before the ALJ, plaintiff testified that she had a difficult time working because she is unable to "handle stress." *Id.* at 18.

Plaintiff's mental limitations have been addressed over the years by various professionals. The following is a summary of the findings from the care providers that have treated or evaluated the plaintiff since her alleged disability onset date of February 26, 2008.

Plaintiff was treated by Dr. Suresh Patil, at Oswego Hospital Behavioral Services ("Oswego Hospital"), on July 28, 2008. AT 261-62, 305-06. At the time, Dr. S. Patil did not believe plaintiff was psychotic, but reported that she was "having trouble with some anxiety." *Id.* Dr. S. Patil diagnosed plaintiff with dysthymia, panic disorder, slightly overweight, with

a global assessment of functioning ("GAF") score of approximately 55-60.[3]
*Id.* at 262, 306.

Plaintiff was again seen by Dr. S. Patil for a follow-up appointment on August 11, 2008. AT 295. Dr. S. Patil's diagnosis and prognosis did not change from plaintiff's first visit in July, although s/he noted his/her observation that plaintiff's panic disorder showed "some improvement." *Id.*[4] In his report of that visit, Dr. S. Patil also repeated the finding that plaintiff is not psychotic. *Id.*

Plaintiff returned to Oswego Hospital on September 10, 2008, at which time he was seen by Dr. Vilas Patil. AT 294. On that occasion, plaintiff complained that she continued to experience panic symptoms, and that she becomes nauseous while in the car and in crowds. *Id.* Dr. V. Patil reported that there was "no evidence of delusions or paranoid ideations" and that plaintiff denied feeling depressed. *Id.* Dr. V. Patil acknowledged plaintiff's diagnoses of panic and dysthmyic disorders. *Id.*

Plaintiff was again seen at Oswego Hospital by Dr. S. Patil on

---

[3]     The GAF scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (Am. Psychiatric Assoc., 4th ed. Text Revision 2000) ("DSM-IV-TR"). A GAF of fifty-five indicates moderate difficulty in social, occupational or school functioning. DSM-IV-TR at 34.

[4]     The record does not reveal Dr. S. Patil's gender.

October 8, 2008.  AT 293.  During that visit, plaintiff reported that,
although she still experienced some "panicky feelings," she was "doing
pretty well" and responding well to the medications Dr. S. Patil prescribed
in earlier visits.  *Id.*  Dr. S. Patil's diagnosis at that time included only
dysthymia.  *Id.*

Plaintiff was next seen at Oswego Hospital on July 2, 2009, on this
occasion by Dr. Lackshman Prasad.  AT 361.  During that visit, plaintiff
complained of anxiety symptoms, and described experiencing mood
fluctuations.  *Id.*  Dr. Prasad reported a diagnosis of bipolar disorder and
impulse control, and noted that plaintiff's "insight and judgment were
somewhat compromised."  *Id.*  At that time, Dr. Prasad transferred plaintiff
to the care of Nurse Practitioner ("NP") Andrew Catalone.  *Id.*

Since that time, plaintiff has met with NP Catalone approximately
twice per month, principally for medication management.  *Id.* at 20, 232.
Between July 2009 and February 2011, NP Catalone reported seeing
plaintiff for 16 appointments of 15 minute durations.  AT 228-29, 231, 258-
60, 273, 276-77, 279-82, 286-88, 344, 346, 349, 351, 355.[5]  During that
same period of time, plaintiff was seen once by Joyce Behling ("NP

---

[5]     Some of the citations to NP Catalone's reports include references to duplicative
reports in the administrative record.

Behling"), another nurse practitioner at Oswego Hospital, on August 12, 2009.  *Id.* at 289.  With three exceptions, the reports generated by NP Catalone and NP Behling note a diagnosis of bipolar disorder, hypomanic, and impulse control disorder.  *Id.* at 229-30, 228, 258-59, 273, 276-77, 279-82, 286-89, 349, 351, 355.  The first appointment with NP Catalone included a diagnosis of only dysthmyic disorder, panic disorder, and obesity.  *Id.* at 231, 260.  In the notes of the last two appointments NP Catalone included a diagnosis of only bipolar disorder and impulse control disorder.  *Id.* at 346, 344.  In addition, in notes from 11 of the 16 appointments, NP Catalone reported plaintiff's depression and anxiety fluctuated or increased.  *Id.* at 229, 231, 260, 273, 276-77, 279-80, 286, 288, 344, 346, 351, 355.  After six of the 16 appointments, NP Catalone reported plaintiff's concentration and focus as fair, decreased, or fluctuating.  *Id.* at 231, 260, 273, 344, 346, 351, 355.  In reports from eight of the 16 appointments, NP Catalone noted that plaintiff experienced mood swings, irritability, and anger.  *Id.* at 276-77, 279-81, 288, 344, 346, 351, 355.  At only one appointment, on April 22, 2010, NP Catalone reported plaintiff complaining of auditory hallucinations and appearing to have "some problems with psychosis."  *Id.* at 279.

Notes of plaintiff's visits to NP Catalone record some variances in her condition from visit-to-visit. At the appointments where plaintiff appeared to have the most difficulty, NP Catalone invariably reported a corresponding issue with plaintiff's medications. *Id.* at 279-80, 351, 355. At all of his appointments with plaintiff, NP Catalone observed that plaintiff's appearance was good, she never experienced paranoia. *Id.* at 228-30, 258-59, 273, 276-77, 279-82, 286-89, 349, 351, 355. Following plaintiff's appointment on February 25, 2011, NP Catalone reported that he "do[es] not feel that [plaintiff] could ever participate in the work environment due to her mood swings, irritability, anger, and antisocial personality disorder." *Id.* at 344. Finally, in NP Catalone's medical source statement, he reported that plaintiff has marked limitations in interacting appropriately with the public, supervisors and co-workers, and is moderately limited in her ability to respond appropriately to usual work situations and to changes in a routine work setting. *Id.* at 256. He also noted that plaintiff "experiences severe difficulty with mood disability and impulse control. These symptoms result in marked impairment of her ability to cope with stressors." *Id.*

In addition to NP Catalone, plaintiff attended 20 counseling sessions

at Oswego Hospital with Michael Herrera, CSW, ASCW, BCD, between February 2010 and February 2011. AT 271-72, 274-75, 278, 283-85, 345, 347-49, 352-53, 356-60, 384. Those sessions focused primarily on stabilizing plaintiff's mood and managing the various changes in her personal life, such as her living situation and children's health. *See generally id.*

Dr. Kristen Barry, Ph.D., conducted a consultative psychiatric evaluation of the plaintiff on February 9, 2010. AT 232-36. Based upon her examination, Dr. Barry found plaintiff to have fair relational and social skills. *Id.* at 234. She also found that plaintiff's attention and concentration are intact, and that she is capable of counting and making simple calculations. *Id.* Dr. Barry opined that plaintiff does not have difficulty with her ability to perform daily tasks, including to dress, bathe, and groom herself, and cook, clean, and do laundry. *Id.* at 235. Dr. Barry observed that plaintiff is able to understand simple instructions and maintain her attention and concentration "fairly well." *Id.* Dr. Barry also noted that plaintiff "gets frustrated easily and may have difficulty making appropriate decisions." *Id.* Significantly, Dr. Barry concluded that plaintiff's "allegations are found to be consistent with examination results."

*Id.*  Finally, Dr. Barry diagnosed plaintiff with cocaine abuse, in remission; cannabis abuse, in remission; obsessive compulsive disorder; intermittent explosive disorder; and rule out bipolar disorder.  *Id.*

Plaintiff's records were examined by Dr. M. Morog, a state agency review psychologist.  AT 237-54.  Based upon his review, Dr. Morog diagnosed plaintiff with obsessive compulsive disorder and intermittent explosive disorder, with a medical history of polysubstance abuse.  *Id.* at 242, 244-45.  Dr. Morog completed a psychiatric review technique, in which he concluded that plaintiff has mild restrictions in activities in daily living; mild difficulties in maintaining concentration, persistence, or pace; and moderate difficulties in maintaining social functioning, with insufficient evidence of repeated episodes of decompensation.  *Id.* at 247.  In an accompanying mental RFC assessment, Dr. Morog concluded that plaintiff is moderately limited in her abilities to understand and remember detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavior extremes.  *Id.* at 251-52.

As is evident from the diagnoses of Dr. Barry and Dr. Morog, and the record confirms, plaintiff has a history of illicit drug use, including ecstasy, cocaine, and marijuana.  AT 21, 233, 245, 261, 361.  Although plaintiff admits to using marijuana as recently as the spring of 2010, *id.* at 281, 280, 276, the record evidence suggests that plaintiff has been in remission from drug addiction since 2002.[6]  *Id.* at 21, 228-31, 235, 258, 260-61, 273, 282, 286-89, 305, 346, 349, 351, 355, 361.

II.    PROCEDURAL HISTORY

A.     Proceedings Before the Social Security Administration

Plaintiff applied to the Social Security Administration ("SSA") for SSI benefits on January 28, 2010, alleging a disability onset date of February 26, 2008.  AT 150-54.  The application was initially denied on February 22, 2010.  *Id.* at 57-62.  At plaintiff's request, a hearing was conducted with regard to the denial of her application on April 7, 2011, before ALJ Rosanne Dummer.  *Id.* at 12-36.  Following the hearing, at which plaintiff was represented by counsel, and testimony was received from the plaintiff and a vocational expert, the ALJ rendered a written decision, dated April 22, 2011, denying heapplication for benefits.  *Id.* at 38-56.

---

[6]    It should be noted that plaintiff was incarcerated as the result of a conviction for burglary and drug possession between 2002 and January 2006.  AT 233-34, 307.

In her decision, ALJ Drummer applied the now-familiar five-step prescribed test for evaluating claims of disability. At step one, she concluded that plaintiff has not engaged in substantial gainful activity since January 12, 2010, the date of plaintiff's application. AT 43. At step two, the ALJ found that plaintiff suffers from multiple severe impairments, including bipolar disorder, impulse control disorder, obsessive compulsive disorder, depression, anxiety, and cocaine and cannabis abuse in remission. *Id.* At step three, however, the ALJ concluded that those impairments, either individually or in combination, do not meet or medically equal any of the listings of presumptively disabling conditions set forth in the applicable regulations. *Id.*

Before proceeding to step four, the ALJ concluded that plaintiff retains the RFC to "follow and understand simple directions and instructions, and [plaintiff] is able to maintain attention and concentration . . . [and] is limited to routine, repetitive type tasks involving occasional contact with others." AT 45. In arriving at her RFC determination, the ALJ concluded that, although plaintiff's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms. . . [plaintiff's] statements concerning the intensity, persistence and limiting

effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC]." *Id.* at 49. Additionally, the ALJ concluded that she could not "rule out the [e]ffect of ongoing substance abuse on [plaintiff's] mood swings and irritability and functioning." *Id.* The ALJ assigned "great weight" to Dr. Barry's consultative opinions because she found them to be "consistent with the overall record evidence." *Id.* at 50. The ALJ also attributed "great weight" to Dr. Morog's opinions because "[t]he evaluator is experienced in the sequential evaluation process and familiar with Social Security rules and regulations, and the opinion is consistent with the overall evidence of record." *Id.* In contrast, the ALJ assigned "little weight" to the opinion of NP Catalone regarding her limitations noting, *inter alia*, that "it is inconsistent with [plaintiff's] treatment record noting mostly positive evaluations and mental status findings, and her busy activities of daily living." *Id.* at 51. Finally, the ALJ concluded that "[n]othing in [plaintiff's] clinical signs suggest that the [RFC] assessment is unreasonable. Nor does the medical record reflect a treatment regimen inconsistent with such limitations." *Id.*

At step four, the ALJ concluded that plaintiff has no past relevant work. AT 51. At step five, the ALJ found, based upon the testimony of a

vocational expert in response to hypothetical questions approximating plaintiff's RFC and other relevant characteristics, that jobs exist in significant numbers in the national economy that plaintiff can perform.[7]  *Id.* at 52.

Based upon that finding, ALJ Drummer concluded that plaintiff is not disabled, and therefore does not qualify for SSI benefits.  AT 53.  The ALJ's determination became final on August 31, 2011, when the Social Security Administration Appeals Council rejected plaintiff's application for review of that decision.  *Id.* at 1-3.

B.    Proceedings in This Court

Plaintiff commenced this action on September 26, 2011.  Dkt. No. 1.  Issue was thereafter joined by the Commissioner's filing of an answer, accompanied by an administrative transcript of the evidence and proceedings before the SSA, on March 9, 2012.  Dkt. Nos. 9, 10.  With the filing of the briefs on behalf of the plaintiff on April 23, 2012, Dkt. No. 13, and the Commissioner on June 6, 2012, Dkt. No. 14, the matter is now ripe for determination, and has been referred to me for issuance of a

---

[7]    The vocational expert also testified that there would be no available jobs that plaintiff would be capable of performing if she "assume[d] [that plaintiff's] testimony was completely credible and supported by the medical evidence and all of the impairments were supported by the medical evidence."  *Id.*

report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(d).  See also Fed. R. Civ. P.

72(b).[8]

III.   DISCUSSION

   A.   Scope of Review

   A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied, and whether the decision is

supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586

(2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal

v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp.

2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817

F.2d 983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to

whether the Commissioner applied the proper legal standards, his

decision should not be affirmed even though the ultimate conclusion

---

[8]     This matter has been treated in accordance with the procedures set forth in
General Order No. 18 (formerly General Order No. 43), which was issued by the Hon.
Ralph W. Smith, Jr., then-Chief United States Magistrate Judge, on January 28, 1998,
and amended and reissued by Chief District Judge Frederick J. Scullin, Jr., on
September 12, 2003.  Under General Order No. 18, in an action such as this, once
issue has been joined and the parties have submitted their briefs, the court considers
the case as if both parties have submitted a motion for judgment on the pleadings
pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

reached is arguably supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 148 (citing *Johnson*, 817 F.2d at 986).  If, however, the correct legal standards have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision will withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  42 U.S.C. § 405(g); *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp. 2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.).

The term "substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003).  To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record.  *Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427 (quoting *Consolidated Edison Co.*, 308 U.S. at 229, 59 S. Ct. 219); *Martone*, 70 F. Supp. 2d at 148 (quoting *Richardson*).  "To determine on appeal whether an ALJ's

findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the SSA's determination, the SSA's decision will be reversed. 42 U.S.C. § 405(g); *Martone*, 70 F. Supp. 2d at 148. In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain her reasoning. *Martone*, 70 F. Supp. 2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)). A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level. *Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991). Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability"

in the record and it would serve no useful purpose to remand the matter for further proceedings before the SSA.  *Parker*, 626 F.2d at 235; *see also Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

  B. <u>Disability Determination - The Five Step Evaluation Process</u>

  The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A). In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* at § 423(d)(2)(A).

  The agency has prescribed a five step evaluative process to be

employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further.  *Id.* at §§ 404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities.  *Id.* at §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations. *Id. at* §§ 404.1520(d), 416.920(d), Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled."  *Id.* at §§ 404.1520(d), 416.920(d); *see also Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If it is determined that it does, then as a final matter, the agency must

examine whether the claimant can do any other work.  *Id.* at §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies with the claimant.  *Burgess v. Astrue*, 537 F.3d 117, 118 (2d Cir. 2008); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work.  *Burgess*, 77 F.3d at 118; *Perez*, 77 F.3d at 46.  In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills. *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

C.     The Evidence in This Case

In support of her appeal, plaintiff argues that (1) the ALJ's RFC determination is not supported by substantial evidence, and was not made after conducting the requisite function analysis of plaintiff's work-related capabilities; (2) the ALJ erred in assessing plaintiff's credibility; and (3) the errors in formulating an RFC determination and assessing credibility, compounded by the ALJ's failure to consider plaintiff's stress limitations, difficulty in making decisions, and susceptibility to frustration, undermine

the step five finding of no disability.

1.    The ALJ's RFC Determination

Plaintiff assigns error to the ALJ's RFC determination in five respects, contending that she (1) failed to fulfill her obligation to fill critical gaps in the record by eliciting further opinions from a treating physician; (2) failed to give proper weight to NP Catalone's opinions; (3) failed to fully include the limitations identified by Drs. Barry and Morog, despite giving their opinions "great weight"; (4) failed to apply the required psychiatric review technique; and (5) failed to provide a function-by-function analysis. Plf.'s Memo. of Law (Dkt. No. 13) at 11-23.  In response, defendant argues that (1) the ALJ's RFC assessment is supported by substantial evidence; (2) the ALJ did, in fact, assign some weight to NP Catalone's opinions; and (3) the ALJ was under no obligation to recontact a treating physician because the existing record completely reflects plaintiff's medical history.  Def.'s Memo. of Law (Dkt. No. 14) at 14-18.  For the reasons set for the below, I recommend that each of plaintiff's arguments be rejected.

(a)    The ALJ's Failure to Recontact Dr. S. Patil

The Commissioner's regulations require that an ALJ develop a

claimant's complete medical history for at least twelve months prior to the

filing of an application for benefits, and longer if necessary to reach an

informed decision.  20 C.F.R. § 416.912(d); *see DeChirco v. Callahan,*

134 F.3d 1177, 1184 (2d Cir. 1998).  This obligation exists regardless of

whether the claimant is represented by counsel or a paralegal, or instead

is proceeding *pro se*, in which case the duty is heightened.  *Perez*, 77

F.3d at 47; *DeVora v. Barnhart*, 205 F. Supp.2d 164, 172 (S.D.N.Y. 2002).

The duty of an ALJ to develop the record is particularly acute when there

are gaps of information from a claimant's treating physician.  *Boswell v.*

*Astru*e, No. 09-CV-0533, 2010 WL 3825622, at *4 (N.D.N.Y. Sept. 7,

2010) (Bianchini, M.J.), *adopted in its entirety by* 2010 WL 3825621

(N.D.N.Y. Sept. 23, 2010) (Mordue, C.J.).

In this instance, however, Dr. S. Patil does not qualify as a treating

physician.  The regulation defining a treating physician, for purposes of

the SSA, provides in pertinent part, as follows:

> Treating source means your own physician,
> psychologist, or other acceptable medical source
> who provides you, or has provided you, with medical
> treatment or evaluation and who has, or has had, an

22

> ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

20 C.F.R. §§ 404.1502, 416.902.

A review of the administrative record reveals that Dr. S. Patil does not meet this definition of a treating physician. Dr. S. Patil examined plaintiff on only three occasions – on July 28, 2008, August 8, 2008, and October 8, 2008. AT 261, 293, 295, 305. On November 5, 2008, plaintiff did not attend her scheduled appointment with Dr. S. Patil, and she failed to respond to a follow-up letter that was subsequently sent to her by the doctor's office. *Id.* at 291. On February 25, 2009, Oswego Hospital closed plaintiff's case with Dr. S. Patil as a result of her failure to attend her appointment or communicate with Oswego Hospital. *Id.* The next time plaintiff sought treatment from Oswego Hospital was on July 2, 2009, when she was seen by Dr. Prasad. *Id.* at 361. At that appointment, Dr.

Prasad transferred plaintiff's care to NP Catalone, who continued to treat her at least through February 25, 2011.  *Id.*

After careful consideration, I conclude that three examinations by Dr. S. Patil over the course of four months in 2008 does not constitute the type of "ongoing relationship" that is required for finding that s/he is plaintiff's treating physician under the relevant regulations.  20 C.F.R.  §§ 404.1502, 416.902; *see also Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 490-91 (6th Cir. 2005) (finding that plaintiff did not have an ongoing relationship with Dr. Pinson where Dr. Pinson saw the plaintiff only twice over the course of three days, and where the plaintiff sought treatment for the same issue "from other sources on many more occasions" than these two visits); *Coy v. Astrue*, No. 12-CV-0381, 2012 WL 5497850, at *6 (N.D. Ohio Nov. 13, 2012) ("Two instances of treatment four months apart are not sufficient to establish a treating relationship.").[9]  For this reason, I conclude that the ALJ was under no duty to develop the record by eliciting additional information from Dr. S. Patil.

---

[9]      In coming to this conclusion, I also note that plaintiff has not provided any support for her position that Dr. S. Patil qualifies as her treating physician after only three examinations over the course of four months.  *See generally* Plf.'s Memo. of Law (Dkt. No. 13) at 11-13.

(b)    The Weight Owing to NP Catalone's Opinions

On June 7, 2010, NP Catalone completed a medical source statement in which he concluded, in relevant part, that plaintiff has a marked limitation in her ability to interact appropriately with the public, supervisors, and co-workers; a moderate limitation in her ability to respond appropriately to usual work situations and to changes in a routine work setting; and "severe difficulty with mood lability and impulse control.. . .result[ing] in marked impairment of her ability to cope with stressors." AT 255-57.  ALJ Drummer assigned "little weight" to NP Catalone's opinions, finding them to be inconsistent with treatment records, which "not[ed] mostly positive evaluations and mental status findings," and based further upon the extent of her daily activities. AT 51.  Plaintiff challenges that implicit rejection and concludes that NP Catalone's opinions should have been given at least "some weight by the ALJ."  Plf.'s Memo. of Law (Dkt. No. 13) at 13-19.

Having carefully examined NP Catalone's treatment notes, I find that the ALJ's conclusion that his opinions are inconsistent is supported by substantial evidence, bearing in mind that "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Richardson*, 402 U.S. at 401.  The following summary of NP Catalone's reports, which includes one report from NP Behilng, is illustrative of this point.[10]

None of the 16 reports from NP Catalone and NP Behling note that plaintiff has experienced suicidal or homicidal ideations.  In 13 of the 16 reports it was noted that either plaintiff's depression and anxiety was controlled, or they fluctuated up and down.  In all 16 reports, plaintiff's appearance was rated as "good."  None of the reports note any evidence of paranoia.  With one exception, NP Catalone reported that plaintiff did not experience hallucinations.  In nine of the 16 reports, plaintiff's concentration and focus were assessed as good or fair.  Only half of the time did plaintiff experience mood swings, irritability, and anger.  While there were occasions when plaintiff appeared to have the most difficulty – such as when NP Catalone noted that plaintiff attended the session in an "anxious mood," complained of "a significant decompensation in her symptoms," or complained of experiencing an auditory hallucination – NP Catalone also reported that she had difficulty with her medications, in that

---

[10]    All 16 of the reports by NP Catalone and NP Behling between July 2009 and February 2011 are found at AT 228-29, 231, 258-60, 273, 276-77, 279-82, 286-89, 344, 346, 349, 351, 355.  NP Catalone's medical source statement can be found at AT 255-57.

she complained about feeling addicted to or running out of them, or asking to be placed back on medication for her bipolar disorder. NP Catalone's last report noted plaintiff's inability to work due to mood swings and an antisocial personality disorder. Also, NP Catalone's medical source statement includes his opinion that plaintiff is markedly limited in acting appropriately with the public, and moderately limited in her ability to respond appropriately to usual work situations.

Taking all of NP Catalone's reports together, I conclude that there is "more than a mere scintilla" of evidence that supports the ALJ's finding that NP Catalone's opinions are inconsistent within his own treatment records. *Richardson*, 402 U.S. at 401; *see also Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992 ) ("The Secretary's finding will be sustained if supported by substantial evidence, even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the Secretary's.") (internal citations omitted). Accordingly, I recommend that this argument be rejected.

(c)   Reconciliation of Plaintiff's Limitations, as Identified by Drs. Barry and Morog, in Determining Plaintiff's RFC

Plaintiff next argues that the ALJ was required to explain how her RFC assessment reconciled some of the differing limitations identified by Drs. Barry and  Morog.  Plf.'s Memo. of Law (Dkt. No. 13) at 19-21.  More specifically, plaintiff contends that, because Dr. Barry found that plaintiff had "difficulty handling stress and gets frustrated easily and may have difficulty making appropriate decisions," the ALJ was required to explain how those findings comport with her RFC determination.  *Id.* at 20.  Similarly, plaintiff argues that, because Dr. Morog found that plaintiff is moderately limited in her ability to "maintain attention and concentration for extended periods," to respond to changes in a work setting, and to ask simple questions or request assistance, the ALJ was required to explain how these findings are consistent with her RFC determination.  *Id.* at 20-21.

It is true that "[r]emand is . . . appropriate where. . . [a court] is 'unable to fathom the ALJ's rationale in relation to the evidence in the record' without 'further findings or clearer explanation for the decision.'" *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Berry v.*

28

*Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982); *see also Sweat v. Astrue*, No. 08-CV-1108, 2011 WL 2532932 at *6 (N.D.N.Y. May 23, 2011) (Bianchini, M.J.) (finding that the ALJ's RFC determination not supported by substantial evidence where "[t]he ALJ noted the consultative examiners' findings that Plaintiff would have difficulty dealing with stress, but did not explain how he reconciled those findings with his RFC assessment (which contained no determination regarding stress)"); *James v. Astrue*, No. 09-CV-0424, 2010 WL 5536338, at *6 (N.D.N.Y. May 7, 2010) (Bianchini, M.J.) (recommending remand where "[t]he ALJ 'accepted' [the consultative examiner's] assessment, but made no attempt to reconcile his conclusion that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently with [the consultative examiner's] determination that Plaintiff had a moderate-to-severe limitation as to lifting").

Here, however, the court is not confronted with such a circumstance. The ALJ's ten-page decision accounts for nearly every piece of medical evidence in the record. *See generally* AT 38-53. In her decision, the ALJ comprehensively discussed the findings of both Dr. Barry and Dr. Morog, and concluded that their findings were not inconsistent with her RFC determination. *Id.* at 50. Although the ALJ did not explain how she

arrived at this conclusion, there is substantial evidence in the record to support it. For example, the ALJ's RFC assessment limits plaintiff's abilities to "simple, routine, repetitive type tasks involving occasional contact with others," *id.* at 45, a finding that is not in conflict with Dr. Barry's determination that plaintiff has a history of obsessive-compulsive traits, anxiety, difficulty handling stress, and is easily frustrated, *id.* at 235. Indeed, had the ALJ's RFC assessment included an ability to process complex instructions or carry out multiple tasks at once, it would have directly conflicted with Dr. Barry's findings that plaintiff is easily frustrated and can only undertake repetitive tasks. Instead, there is nothing in the record to suggest that the anxiety and difficulty handling stress that Dr. Barry discerned would preclude plaintiff from undertaking simple, routine, repetitive tasks.

Similarly, Dr. Morog's findings that plaintiff is moderately limited in her ability to understand and remember detailed instructions and maintain attention for an extended period of time does not appear to limit plaintiff's ability to undertake the types of tasks envisioned by the ALJ's RFC assessment, especially because the RFC limits plaintiff to tasks that do not routinely involve interacting with people. Finally, considering, as a

whole, NP Catalone's and Mr. Herrera's report notes from their appointments with plaintiff, it appears that, at the time of the hearing, plaintiff had already been undertaking tasks that meet the description of her RFC, including cleaning her home daily and taking her children to their scheduled, weekly appointments – both of which are routine and repetitive, and do not involve significant interaction with people.  For these reasons, I recommend that plaintiff's argument that the ALJ's RFC determination is unsupported because she failed to reconcile some of the limitations set forth by Drs. Barry and Morog be rejected.

        (d)    <u>Whether the ALJ Erred in Failing to Apply the Psychiatric Review Technique</u>

When considering a mental impairment at the second and third steps of the sequential analysis, an ALJ must apply a "special technique" set forth in 20 C.F.R. §§ 404.1520a(a) and 416.920a(a) to determine whether it is severe.  *Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008).  The prescribed analysis requires that the ALJ consider whether the claimant has a medically determinable impairment, and that she rate the degree of the claimant's functional limitation resulting from the impairments in four areas, including (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of

decompensation.[11]  20 C.F.R. §§ 404.1520a(c)(3); 404.920a(c)(3).  The

first three areas are rated on a scale of "none, mild, moderate, marked,

and extreme," and the last area is rated on a scale of "[n]one, one or two,

three, four or more."  20 C.F.R. §§404.1520a(c)(4); 416.920a(c)(4).

Generally, if the degree of limitation in the first three areas is mild or none

and there are no episodes of decompensation, then the impairment is not

severe.  20 C.F.R. § 1520a(d)(1).  If the claimant's mental impairment is

severe, the ALJ must next determine whether the impairment meets or

equals the severity of any listed mental disorder.  20 C.F.R. §

404.1520a(d)(2); *see also Kohler*, 546 F.3d at 266.  If so, the claimant will

be found disabled; otherwise, the ALJ must next assess the claimant's

RFC.  20 C.F.R.  § 404.1520a(d)(3).

    An ALJ's failure to apply the special technique constitutes a ground

for remand absent a finding of harmless error.  *See O'Connell v. Astrue*,

No. 06-CV-1113, 2009 WL 606155, at *21 (N.D.N.Y. Mar. 9, 2009) (Kahn,

J.) (explaining that, although the Second Circuit found that failure to apply

the special review technique was legal error, it had left open the possibility

---

[11]     "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Kohler*, 546 F.3d at 266 n.5.

that an ALJ's failure to apply it would be harmless error, as when, for example, "an ALJ actually complied with the special technique by making determinations regarding a [claimant's] degree of limitation . . . but merely fail[ed] to strictly comply with the documentation requirement").

Plaintiff does not challenge the ALJ's application of the special technique to her step-two and step-three determinations. Plf.'s Memo. of Law (Dkt. No. 13) at 21-22. Instead, she asserts that the ALJ erred in failing to consider the four activities identified in "paragraph B" criteria Listings of § 12.00 *et al.,* related to adult mental disorders, in arriving at his RFC. *Id.*

It is clear that the psychiatric review technical required by regulation extends beyond merely considering limitations associated with mental impairments at steps two and three of the sequential analysis, and extends further into the RFC determination. As the Commissioner has noted, addressing the psychiatric review technique,

> [t]he adjudicator must remember that the limitations identified in the "paragraph B" and "C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. *The mental RFC assessment used at steps four and five of the sequential evaluation process requires a more detailed assessment by itemizing various functions*

> *contained in the broad areas found in paragraphs B and C of Adult Mental Disorders Listings and 12.00 of the Listing of Impairments, and summarized on the [Psychiatric Review Technique Form].*

Social Security Ruling ("SSR") 96-8p (emphasis added).

In her determination, ALJ Drummer indicated her awareness of this requirement, noting, after referencing SSR-96-8p, that "the following residual functional capacity assessment reflects a degree of limitation the undersigned as found in the 'paragraph B' mental function analysis." AT 44. In arriving at her RFC finding, ALJ Drummer engaged in a comprehensive discussion of the available evidence, extending over a period of seven pages. *Id.* at 45-51. While her decision could have been included greater detail to indicate consideration of the specific paragraph B criteria, including activities of daily living, difficulties of maintaining social functioning, and difficulties in maintaining concentration, persistent or pace, it is nonetheless apparent that she did consider those factors and weighed them against the record evidence.[12] *Id.* Accordingly, I conclude that the ALJ did not fail to comply with the psychiatric technique specified by the Commissioner's regulations in arriving at her RFC finding.

---

[12] Plaintiff has not alleged that she suffered any episodes of decompensation of extended duration, nor does the record reveal any evidence of such incidents.

(e)    Whether the ALJ Erred by Failing to Engage in a
        Function-by-Function Analysis

When determining a plaintiff's mental RFC, the ALJ is required to

itemize various functions contained in the broad categories of 20 C.F.R. §

416.920a.  SSR 96-8p; *see also Tilbe v. Astrue*, No. 10-CV-0910, 2012

WL 2930784, at *11 (N.D.N.Y. July 17, 2012) (Mordue, J.).  "The particular

functions that must be assessed are the basic work-related mental

activities specified by the regulations – such as limitations in

understanding, remembering, and carrying out instructions, and in

responding appropriately to supervision, co-workers, and work pressures

in a work setting[.]" *Tilbe*, 2012 WL 2930784, at *11 (citing, *inter alia*, 20

C.F.R. §§ 404.1520a(d)(3), 404.1545(c), 416.920a(d)(3), 416.945(c)).

Here, I find that the ALJ adequately assessed "the basic work-

related mental activities specified by the regulations."  *Tilbe*, 2012 WL

2930784, at *11.  Specifically, in her RFC assessment, ALJ Drummer

concluded that plaintiff "is able to follow and understand simple directions

and instructions, and she is able to maintain attention and concentration.

She is limited to simple, routine, repetitive type tasks involving occasional

contact with others."  AT 45 (internal citation omitted).  This RFC

assessment takes into consideration the work-related activities envisioned

by the regulations, including assessing plaintiff's ability to understand, remember, and carry out instructions, and plaintiff's ability to interact with others.  *See*, *e.g.*, 20 C.F.R. § 416.945(c) (instructing that the Commissioner will take into consideration certain "mental activities" in assessing a claimant's RFC, "including limitations in understanding, remembering, and carrying out instructions, and responding appropriately to supervision, coworkers, and work pressures in a work setting").  In addition, the ALJ's RFC determination as it relates to these "work-related mental activities" is supported by substantial evidence in the record, including, but not limited to, the opinions of Drs. Barry and Morog.

## 2.    The ALJ's Assessment of Plaintiff's Credibility

Plaintiff asserts that the ALJ erred in assessing her credibility.  In support of her contention, plaintiff alleges that the ALJ improperly evaluated her credibility by comparing plaintiff's alleged limitations to her RFC determination, failed to adequately explain how plaintiff's daily activities are inconsistent with her complaints, and failed to acknowledge her OCD diagnosis and its effects upon her ability to perform work-related functions.  Plf.'s Memo. of Law (Dkt. No. 13) at 23-26.  In response, defendant argues that the evidence, including plaintiff's criminal, drug, and

work histories, supports the ALJ's credibility assessment, and that the court should defer to the Commissioner's credibility assessment.  Def.'s Memo. of Law (Dkt. No. 14) at 18-20.

As it relates to plaintiff's first argument, "[a]n [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. April 22, 1999) (Kahn, J.) (quoting *Gallardo v. Apfel*, No. 96-CV-9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998) (Pooler, J.) ("Social Security regulations describe a two-step process for evaluating a claimant's symptoms, including pain.").  First, the ALJ must determine, based on the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain and other symptoms

alleged[.]" 20 C.F.R. § 404.1529(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) the location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to alleviate symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. § 404.1529(c)(3).  An ALJ's evaluation of a plaintiff's credibility is entitled to great deference provided it is supported by substantial evidence.  *Murphy v. Barnhart*, No. 00-CV-9621, 2003 WL 470572, at *10 (S.D.N.Y. Jan. 21, 2003).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); *see also Martone*, 70 F. Supp. 2d at 151. If such testimony is rejected, however, the ALJ must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence. *Martone*, 70 F. Supp. 2d at 151 (citing *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)). Where the ALJ's findings are supported by substantial evidence, the decision to discount subjective testimony may not be disturbed on court review. *Aponte v. Sec'y, Dep't of Health & Human Svcs.*, 728 F.2d 588, 591 (2d Cir. 1984).

Here, the ALJ concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment." AT 49. This assessment of plaintiff's credibility is formed only on the basis of how plaintiff's statements compare to the ALJ's RFC assessment. The ALJ's analysis is therefore fatally flawed, because, it demonstrates

that she improperly arrived at her RFC determination before making her credibility assessment, and engaged in a credibility assessment calculated to conform to that RFC determination. *See Gehm v. Astrue*, No. 10-CV-1170, 2013 WL 25976, at *5 (N.D.N.Y. Jan. 2, 2013) (Hurd, J.) ("A claimant's credibility may be questioned if it is inconsistent with medical evidence.  However, it is improper to question the plaintiff's credibility because it is inconsistent with the RFC determined by the ALJ."); *see also Zenka v. Astrue*, — F. Supp. 2d —, No. 11-CV-7039, 2012 WL 5613646, at *11 (N.D. Ill. Nov. 15, 2012) ("Additionally, the phrase 'to the extent they are inconsistent with the above [RFC]' indicates that the ALJ first determined what Plaintiff's RFC would be and then used that determination to assess Plaintiff's credibility, a reversal of the proper order of an RFC assessment." (citing *Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012)); *Bostic v. Astrue*, No. 10-CV-1153, 2012 WL 786909, at *1 (D. Or. Mar. 9, 2012) (holding that, although "[a]n ALJ may not simply define an RFC and then, without more, conclude the claimant's testimony is only credible to the extent it aligns with the RFC[,] . . . there is nothing wrong with an ALJ stating a conclusion and then explaining it" (internal quotation marks and citations omitted)).  It is for that reason that the

regulations require an ALJ, when determining a claimant's credibility as it relates to the intensity, persistence, and limiting effects of the symptoms, to indicate the amount of weight afforded to the claimant's statements *in consideration of the entire case record*.  SSR 96-7p; *see also Nelson v. Astrue*, No. 09-CV-0909, 2010 WL 3522304, at *7 (N.D.N.Y. Aug 12, 2010) (Lowe, M.J.) ("An ALJ's decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the ALJ gave to the individual's statements and the reasons for weight." (citing SSR 96-7p)).

Although the ALJ in this case explained that plaintiff's "criminal and drug use history do little to bolster [plaintiff's] credibility," AT 49, that limited explanation does little to illuminate whether the ALJ considered the entire record in coming to her conclusions regarding credibility.[13]  In

_____

[13]     Parenthetically, to the extent this statement is an implicit conclusion by the ALJ that plaintiff's past drug use actually detracts from her credibility, such a conclusion is not supported by substantial evidence.  While it is true that plaintiff admitted to using marijuana on "rare occasions" as recently as spring 2010, AT 281, 280, 276, the record evidence does not support a conclusion that either plaintiff regularly uses drugs, or that any drug use has an effect on plaintiff's "mood swings and irritability and functioning."  AT 49.  Rather, the record indicates that, except for two relapses prior to 2008, plaintiff has been in remission for drug addiction since 2002. *Id.* at 21, 260, 231, 289, 288, 230, 287, 229, 286, 228, 282, 273, 258, 355, 351, 349, 346, 235, 361,261, 305.  The ALJ's consideration of plaintiff's felony conviction, on the other hand, is proper when assessing plaintiff's credibility.  *Cf.* Fed. R. Ev. 609.

addition, the court notes that, although the ALJ afforded Dr. Barry's opinions "great weight," the ALJ appears to have discredited Dr. Barry's conclusion that plaintiff's "allegations are found to be consistent with examination results," AT 235, a statement which directly conflicts with the ALJ's credibility assessment.

When formulating her RFC finding, ALJ Drummer rejected subjective statements by the plaintiff that conflict with that determination, including her claim that she is unable to deal with the stress of work, and her accounts of prior unsuccessful work experiences. AT 18-19. Because the RFC determination was pivotal to the finding of no disability, the ALJ's failure to properly assess plaintiff's credibility, and its potential effect in undermining the RFC determination, requires that the Commissioner's determination be vacated and the matter remanded for a proper assessment of plaintiff's credibility.

### 3. The ALJ's Step-Five Determination

Plaintiff argues that the ALJ erred at step-five of the sequential disability analysis because the assumption upon which the vocational expert relied when forming her opinions is not supported by substantial evidence. Plf.'s Memo. of Law (Dkt. No. 13) at 26-27. More specifically,

plaintiff argues that because the ALJ's RFC determination is not supported by substantial evidence, the vocational expert's opinions, which are based on that RFC assessment, are flawed. *Id.* In response, defendant argues that the ALJ properly relied on the vocational expert's testimony because the expert properly considered plaintiff's "vocational factors and credibly established RFC." Def.'s Memo. of Law (Dkt. No. 14) at 21-23.

In light of the ALJ's failure to properly assess plaintiff's credibility before arriving at her RFC determination, that RFC determination cannot withstand judicial scrutiny. And, because that RFC determination forms the underpinning for the vocational expert's testimony, the conclusion that there are available jobs that the plaintiff is capable of performing is not supported by substantial evidence. I therefore recommend that the matter be remanded so that the ALJ may, following a reevaluation of plaintiff's credibility and RFC, again conduct a step-five determination.

IV.    SUMMARY AND RECOMMENDATION

While the ALJ in this case did not err in failing to recontact Dr. S. Patil, or in her assessment of the weight to be assigned to NP Catalone's opinions, she failed to properly assess plaintiff's credibility concerning her

limitations.  That failure directly affected the ALJ's RFC finding and, in turn, the opinions given by a vocational expert, based upon the RFC finding, to the effect that there are available jobs in the national economy that the plaintiff is able to perform, despite her limitations.  In light of these errors, the Commissioner's determination of no disability cannot withstand judicial scrutiny, and must be set aside in favor of further proceedings before the SSA, at which plaintiff's credibility may be properly assessed.

It is therefore hereby respectfully

RECOMMENDED that plaintiff's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability VACATED, and the matter REMANDED for further proceedings consistent with this report.

NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldvan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

Dated:      January 24, 2013
              Syracuse, New York

                              David E. Peebles
                              U.S. Magistrate Judge